IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| EDUCATION LOGISTICS, INC., a Montana corporation and LOGISTICS MANAGEMENT, INC., a Washington corporation, | ) ) ) ) ) | CV 07–06–M–DWM |
| Plaintiffs, | ) ) | |
| vs. | ) ) | ORDER |
| LAIDLAW TRANSIT, INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

Education Logistics, Inc., ("Edulog") and Laidlaw Transit, Inc., both move for summary judgment. (Dkt # 195, 198). Laidlaw argues that it is entitled to summary judgment on three categories of damages claimed by Edulog: "look-up-access" damages, royalties, and lost profits. Edulog argues that it is entitled to summary judgment on Laidlaw's counterclaim that the 1992 Agreement is terminable at will. The Court grants both motions in part and denies them in part.

**BACKGROUND**

At the heart of this case is a 1992 contractual agreement ("Agreement")

between the parties in which Laidlaw agreed to use its "best efforts" to promote Edulog's bus-routing software to its school-district customers (Section 2.3.3 of the Agreement). The Agreement also required Laidlaw to pay Edulog royalties for each bus on which the software was installed. In exchange, Edulog granted Laidlaw an exclusive license that, upon its contractual expiration, became a non-exclusive license. In its complaint, Edulog claims, among other things, that Laidlaw breached its royalty and best-efforts obligations.

Edulog also claims that Laidlaw breached the Agreement by providing "look up access" to its school-district customers. As this Court explained, Laidlaw "argues . . . the contract contemplates that the software would be loaded onto customer computers so a school district can view its bus route or bus schedule information. Laidlaw calls this limited access 'look-up access.'" (Dkt # 184). Edulog argues that Laidlaw must pay an additional licensing fee if it provides look-up access.

The Court has already addressed motions for summary judgment in this case. The Court previously determined that Edulog's claims based on conduct prior to January 11, 2003, are barred by the statute of limitations. (Dkt # 128). The Court also determined that the best-efforts provision did not survive the expiration of Laidlaw's exclusive license. (Dkt # 60). Edulog appealed those rulings to the

2

Ninth Circuit. *Educ. Logistics, Inc. v. Laidlaw Transit, Inc.*, 390 Fed. Appx. 742, 744 (9th Cir. 2010).

The Ninth Circuit agreed that the statute of limitations applied, but it concluded that the best-efforts provision could still be enforced. *Educ. Logistics*, 390 Fed. Appx. at 744. The court also concluded that Edulog has submitted sufficient evidence to raise a genuine issue of material fact as to whether Laidlaw "engaged in new breaches of the contract since January 11, 2003." *Id.* The court, however, did not specifically identify that evidence.

On remand, this Court issued a new scheduling order, setting the discovery deadline for November 9, 2011 and the motions deadline for December 9, 2011. (Dkt # 186). The jury trial is scheduled for July 9, 2012. (Dkt # 250). Laidlaw and Edulog both timely filed their motions for summary judgment on November 18, 2011. (Dkt # 195, 198).

## SUMMARY JUDGMENT STANDARD

The Court shall grant summary judgment if the moving party shows there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In *In re Oracle Corp. Securities Litigation*, the Ninth Circuit comprehensively discussed the summary judgment standard:

The moving party initially bears the burden of proving the absence of a

3

genuine issue of material fact. Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence. The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue. In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor. In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all justifiable inferences are to be drawn in its favor.

627 F.3d 376, 387 (9th Cir. 2010).

## ANALYSIS

## I.    Laidlaw's motion for summary judgment

Laidlaw argues that it is entitled to summary judgment on three categories of damages claimed by Edulog: look-up-access damages, lost royalties, and lost profits. The Court grants summary judgment in favor of Laidlaw as to lost profits but denies summary judgment as to look-up-access damages and lost royalties.

### A.    Look-up-access damages

Laidlaw claims that it is entitled to summary judgment on all, or nearly all, of the look-up-access damages proposed by Edulog's expert, Neil Beaton. Laidlaw bases its claim on three arguments: (1) many of the look-up-access damages are

barred by the four-year statute of limitation, (2) 12 of the districts never received look-up access, and (3) Edulog has not provided evidence of damages for breach of contract as to the look-up-access issue. Each of Laidlaw's arguments fails.

### 1.    Look-up-access damages and the statute of limitations

Laidlaw claims that, given the statute of limitations, it is entitled to summary judgement on Edulog's look-up-access claim in 23 instances where it first provided a district with look-up access prior to January 11, 2003, and purportedly provided the district with software updates after that date. There are genuine issues of material fact that preclude summary judgment.

Section 4.7.3 of the Agreement requires Laidlaw to pay a license fee "for *any installation* with a Laidlaw Customer where the Laidlaw Customer requires its own ownership of the software license." (Emphasis added). Edulog argues that software updates are installations and that Laidlaw breached Section 4.7.3 each time it updated a school district's look-up access after January 11, 2003. Laidlaw, on the other hand, claims that software updates are not installations. Under Laidlaw's theory, if it provided initial access prior to the statutory period—January 11, 2003—then it cannot be liable for updates that it provided after that date.

The Court has already determined that there are genuine issues of material

fact as to whether Laidlaw's provision of look-up access (including the initial installation if there was one) is a breach of the Agreement. *See* (dkt # 184). The Court concluded that the parties' intent and the Agreement's fee structure are ambiguous. The same is true with respect to the alleged updates. The Court previously noted, for example, that the fees under Section 4.7.3 are substantial and might contemplate extensive use—e.g., covering both the initial software installation that allows look-up access, as well as subsequent software updates. If that is the case, then an update might not be a separate "installation" under Section 4.7.3 that would give rise to a separate breach of the Agreement. *See Ford. v. Intl. Harvester Co.*, 399 F.2d 749, 752 (9th Cir. 1968) (holding that "natural and ordinary consequences of the initial wrong" are a "continuing breach" and do not constitute a separate breach). But, depending on the parties' intent, the opposite might be true, too.

The bottom line is that the Agreement and the parties' intent regarding look-up access is ambiguous. If this is true with respect to any initial installation, then it is certainly true with respect to subsequent updates. Given this ambiguity, there is a genuine issue of fact that the jury must resolve. *Mary J. Baker Revocable Trust v. Cenex Harvest Sts., Coops., Inc.*, 164 P.3d 851, 866 (Mont. 2007) (holding that when a court determines a contractual ambiguity exists, "the evidence is presented

6

to the jury so that it may determine, on the basis of the written contract, as explained or supplemented by the extrinsic evidence, which of two or more meanings the parties intended." (citing Richard A. Lord, *Williston on Contracts* vol. 11, § 33:39, at 815–16 (4th ed., West 1999))).

Laidlaw alternatively claims that it is entitled to summary judgment for the 23 instances at issue because Edulog's damages expert—Mr. Beaton—merely assumed that the 23 school districts received updates after January 11, 2003. There is no evidence, Laidlaw claims, that those districts actually received the updates. Laidlaw itself, though, highlights a genuine issue of material fact. It acknowledges that Mr. Beaton contends that a spokesperson from one school district—Leslie Daniel—represented that she received updates after January 11, 2003. But, as Laidlaw also observes: "In her deposition . . . Ms. Daniel merely testified that she received updates and upgrades in unspecified years beginning in the 1990s. She did not testify that she ever received upgrades after January 11, 2003." *Id.*

Ms. Daniel's school is perhaps just one example. Edulog claims that Laidlaw, by its own admission: (1) provided look up access to several school districts after 2003 and (2) provided each of those schools with any software updates it received (33 in total after 2003). Edulog's Statement of Genuine Issues ¶¶ 60–65 (dkt # 233). Given the material factual dispute, Laidlaw is not entitled to

7

summary judgment on this issue.

### 2.     Receipt of look up access

Laidlaw also claims it is entitled to summary judgment on Edulog's look-up-access claim as to 12 districts because there is no evidence that Laidlaw ever provided those districts with look up access. Edulog, on the other hand, claims there is a genuine issue of material fact as to whether Laidlaw provided look-up access to those 12 districts. In support of its position, Edulog points to the deposition of Bill Swendsen, a former Laidlaw employee. Mr. Swendson discussed each of the 12 schools and claimed that many of them had look-up access at some point in time, possibly after 2003. Edulog has raised a genuine issue of material fact and Laidlaw is not entitled to summary judgment on this issue.

### 3.     Breach of contract

Finally, Laidlaw argues that Edulog's look-up access claim is, at its heart, a copyright claim, not a breach of contract claim. Since Edulog did not style its claim as a copyright claim, Laidlaw claims it is entitled to summary judgment. *Id.* Laidlaw's argument fails.

The Ninth Circuit has explained that "[a] copyright owner who grants a nonexclusive, limited license ordinarily waives the right to sue licensees for

copyright infringement, and it may sue only for breach of contract." *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 939 (9th Cir. 2010) (citation and internal quotation marks omitted). "However, if the licensee acts outside the scope of the license, the licensor may sue for copyright infringement." *Id.* (citation and internal quotation marks omitted).

If a contractual term limits the scope of a license, the term should be construed as a "condition, the breach of which constitute[s] copyright infringement." *Id.* All other license terms are "covenants, the breach of which is actionable only under contract law." *Id.*

Here, in Section 2.1 of the Agreement, Edulog granted Laidlaw "a perpetual and irrevocable non-exclusive license . . . ." Section 2 of the Agreement sets out the scope of the license. But Edulog claims that Laidlaw violated section 4.7.3 of the Agreement, which does not limit the scope of the license. Section 4.7.3 does not set out what Laidlaw can and cannot distribute to school districts. It simply requires Laidlaw to pay license fees "for any installation with a Laidlaw Customer where the Laidlaw Customer requires its own ownership of the software license." Since Section 4.7.3 does not limit the scope of the license, that term is a "covenant[ ], the breach of which is actionable only under contract law." *Id.* In other words, contrary to Laidlaw's suggestion, this is not a copyright case.

But, even if Edulog had a cognizable copyright claim, that does not prevent Edulog from also bringing a breach of contract claim based on the same conduct. *Benay v. Warner Bros. Enter., Inc.*, 607 F.3d 620, 629 (9th Cir. 2010). "Contract claims for the protection of ideas are not preempted by copyright law if they allege an 'extra element.'" *Id.* "To survive preemption, the state cause of action must protect rights that are qualitatively different from the rights protected by copyright: the complaint must allege an 'extra element' that changes the nature of the action." *Id.* (citations and internal quotation marks omitted). A contractual expectation of compensation—not unlike that found in this Agreement—is an "extra element." *See id.* Edulog may therefore pursue its breach of contract claim, even if it also had a copyright claim.

For the reasons above, Laidlaw is not entitled to summary judgment on Edulog's claim for look-up access damages.

## B.    Lost-royalty damages

Laidlaw claims that it is entitled to summary judgment as to lost royalties because one of Edulog's damages experts—Mr. Beaton—erroneously included lost royalties in his best-efforts damage analysis. Edulog, though, has raised a genuine issue of material fact as to whether Laidlaw caused Edulog to suffer lost royalties.

10

Section 4.4.1(d) of the Agreement requires Laidlaw to pay Edulog a royalty "if installation of Software with [a] new customer occurs within one (1) year after Laidlaw obtains a New Contract." In his report, Mr. Beaton analyzed the amount of money Edulog lost because of unpaid royalties and presented data regarding several schools, which are listed in Schedule 3 of the report. Laidlaw claims that it does not owe royalties for any of the schools listed in Schedule 3 because either: (1) the software installations occurred after the first year of a new contract or (2) Edulog software was not installed as part of the new contract. As a result, Laidlaw argues, it is entitled to summary judgment on Edulog's claim for lost royalties. Laidlaw's argument, though, misses the mark.

Contrary to Laidlaw's suggestion, Edulog does not assert that the conditions in Section 4.4.1(d)—which trigger royalty payments to Edulog—were ever satisfied for the schools listed in Schedule 3. If that was Edulog's argument, then Laidlaw might have a colorable defense. Instead, edulog argues that if Laidlaw had used its best efforts to promote Edulog software to those schools in Schedule 3, then the conditions in Section 4.4.1(d) would have been satisfied. That is, the schools would have implemented Edulog's software (and not a competitor's) within one year after obtaining a contract. Schedule 3, then, identifies what Mr. Beaton believes is the amount of royalties Edulog could have earned if Laidlaw

11

had used its best efforts to promote the software. Of course, whether Edulog can prove that Laidlaw caused those damages is a separate issue.

At a minimum, there is a genuine issue of material fact as to whether Edulog would have been entitled to royalties if Laidlaw had used its best efforts to promote the software. Laidlaw, for example, admits that it influenced numerous school districts to use VersaTrans software instead of Edulog software. And it admits that it considered royalty costs when it decided whether it should promote Edulog software or a competitor's software. There is, therefore, a genuine issue of material fact as to whether Edulog would have been entitled to royalties if Laidlaw had used its best efforts to promote Edulog software.

### C.    Lost-profits damages

Edulog hired an expert, Dr. Alan Hess, to analyze Edulog's lost profits that allegedly resulted from Laidlaw's failure to use its best efforts to promote Edulog's software. Laidlaw claims that Dr. Hess's analysis of lost profits is inadequate as a matter of law because he relies on unsupported assumptions and fails to consider other plausible causes of a purported decline in revenue growth for the Software. The Court agrees and excludes Dr. Hess's testimony under Federal Rules of Evidence 702 and 403. Based on this exclusion, the Court also grants summary judgment in favor of Laidlaw on Edulog's claim for lost profits.

12

A court may grant summary judgment based on the exclusion of expert testimony only if, as a matter of law, the expert's testimony would have to be excluded at trial (e.g., under Federal Rule of Evidence 702 or 403). *Daubert v. Merrel Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("[I]n the event the trial court concludes that the scintilla of [expert] evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to . . . grant summary judgment.").

Federal Rule of Evidence 702 sets out the general requirements for the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

As explained below, the first criterion—helpfulness to the jury—is particularly

13

germane here. "Under Rule 702, expert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading." *Moses v. Payne*, 555 F.3d 742, 756 (9th Cir. 2009) (citation omitted).

Expert testimony may also be excluded under Rule 403 if the testimony's "probative value is substantially outweighed by . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

In short, both Rule 702 and 403 make clear that a court may exclude expert testimony if the proffered testimony is misleading or not supported by the facts. *Moses*, 555 F.3d at 756; *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806 (9th Cir. 1988); *Wood v. Mont. Dept. of Revenue*, 2011 WL 4348301 at *2 (D. Mont. Sept. 16, 2011).

Laidlaw relies on the Ninth Circuit's decision in *McGlinchy* in support of its argument that Dr. Hess's report should be excluded and, indeed, that case is instructive. The plaintiffs in *McGlinchy* sued Shell Chemical Company for antitrust violations, breach of contract, and related torts. 845 F.2d at 804. Like Edulog here, the plaintiffs in *McGlinchy* hired an expert witness to forecast lost profits they suffered as a result of Shell's alleged wrongdoing. *Id.* at 806. For a

14

variety of reasons, the district court excluded the expert testimony under Rule 403 and granted summary judgment in favor of Shell. *Id.* at 806–07.

First, the expert's testimony was misleading and confusing. In his report, the expert quantified in dollar terms the effect of Shell's alleged wrongdoing and attributed all of the future lost profits to Shell. *Id.* at 806. But the expert then acknowledged that he could not attribute the loss to any specific acts. *Id.* Moreover, he admitted that the decline in sales could have theoretically been caused by anything. *Id.* The Ninth Circuit concluded that this inconsistency "would pose a great danger of confusing the fact and cause of damages with the amount of damages." *Id.*

Second, the expert's "before and after" assessment was "hopelessly flawed" because he "did not confirm that relevant market conditions were the same before and after the time the injury was alleged to have occurred." *Id.* at 807 (citations omitted).

Third, the expert compared apples and oranges. The plaintiffs in *McGlinchy* alleged that Shell had acted wrongfully as to specific products, but the expert based his forecast of lost profits on overall gross sales. *Id.* The Ninth Circuit concluded that the expert's overgeneralization and failure to analyze lost profits for the specific product at issue "would pose a great danger of misleading a

15

jury into believing that [the plaintiff's] losses associated with a decline in gross sales were the amount of damages to [the plaintiffs] from 'lost profits' in particular product lines and territories." *Id.*

The court ultimately concluded that the district court had correctly excluded the expert's testimony: "[The expert's] speculation about the amount of [the plaintiff's] 'lost profits' has no basis in the record. His study rests on unsupported assumptions and ignores distinctions crucial to arriving at a valid conclusion." *Id.* (citations omitted).

Dr. Hess's analysis here is strikingly similar to the expert's analysis in *McGlinchy*, and the Court excludes it for similar reasons. First, just as in *McGlinchy*, Dr. Hess's report and deposition testimony are decidedly inconsistent. In his report, Dr. Hess attributes $73.5 million in lost profits to Laidlaw's failure to use its best efforts to promote Edulog's software:

> Based on my analysis of the data, I have formed the opinion that Edulog's profits from its school bus routing software business were at least $73.5 million less than they would have been had Laidlaw used its best efforts to promote Edulog's routing software and related services.[1]

---

[1] Similarly, Dr. Hess closed his report by concluding:

This $73.5 million of lost net operating income from routing software and license and maintenance fees is my estimate of Edulog's loss due to Laidlaw's failure to use its best efforts to promote Edulog's routing software and related services.

But, in his deposition, Dr. Hess admitted that he could not attribute any of the lost profits to Laidlaw's alleged wrongdoing. Instead, he could only say that Edulog experienced a decline in software sales:

> Q.    In your work, were you able to conclude that the decline resulted from a failure by Laidlaw to exercise best efforts under the contract or are you simply identifying that there was a decline?
>
> A.    I've identified that there was a decline beginning in 1997.
>
> Q.    Have you done anything to attempt to attribute that decline specifically to a failure by Laidlaw to comply with its best efforts obligation under the contract, or were you simply identifying there was a decline and leaving it to the plaintiffs to prove at trial what caused the decline.
>
> A.    The latter.
>
> Q.    You're leaving it to the plaintiffs to prove what caused the decline?
>
> A.    Yes.

More generally, Dr. Hess admits that he did not consider any factors—other than Laidlaw's alleged misconduct—that might have caused the decline in Edulog's routing software sales. This is precisely the same type of inconsistency that led the Ninth Circuit in *McGlinchy* to conclude that the expert's proffered testimony would only "confuse the fact and cause of damages with the amount of damages."

845 F.2d at 806.

Second, Dr. Hess presents an apples-and-oranges analysis, just like the expert in *McGlinchy*. Dr. Hess based his forecast of lost profits on the assumption that Edulog should "have been at least as big as VersaTrans in 2005 and 2006." Given that assumption, he concluded: "Edulog's routing software revenue growth rate would have to have been 15 percent per year beginning in 1998 for it to have matched VersaTrans's revenue in 2006." The problem with Dr. Hess's assumption, though, is that he has no idea whether VersaTrans's revenue figures for 2005 or 2006 include revenue from products other than routing software. His analysis is plagued by the same overgeneralization in *McGlinchy*. He compares a company's revenue from a specific product line (Edulog's routing software revenue) with a company's overall revenue that could include revenue from multiple product lines (VersaTrans's overall revenue). Just as in *McGlinchy*, Dr. Hess's report and testimony could pose a great danger of misleading a jury into believing that Edulog's software revenue should match VersaTrans's total revenue, which might include revenue from products other than routing software.

Dr. Hess's report and proffered testimony is speculative, not supported by the facts, contradictory, and troublingly misleading. While the results might be reliable in some respects—insofar that another analyst might take the same,

limited data and arrive at the same results—there is no evidence whatsoever that the results are valid—that they accurately measure what they are supposed to measure. The Court excludes his testimony under both Rule 403 and Rule 702.

Laidlaw argues that, if Dr. Hess's testimony is excluded, it is entitled to summary judgment all together on Edulog's lost-profits claim. The Court agrees. Under Montana law, "[L]ost profits will be allowed only if the loss is proven with a reasonable degree of certainty" and "not speculative." *Riverview Homes II, Ltd. v. Canton*, 38 P.3d 848, 854 (Mont. 2001) (citations omitted).

At this point, Edulog's only evidence of lost profits is Dr. Hess's deficient analysis. As the non-moving party, Edulog "bears the burden of producing evidence sufficient to sustain a jury verdict on those issues for which it bears the burden at trial." *Dark v. Curry Co.*, 451 F.3d 1078, 1082 n.2 (9th Cir. 2006) (citations and internal quotation marks omitted). So far, though, Edulog has produced only speculative evidence. It has not shown that it will be able to prove its lost profits "with a reasonable degree of certainty." *Riverview Homes II*, 38 P.3d at 854. As a result, the Court grants summary judgment in favor of Laidlaw on Edulog's lost-profits claim.[2]

_____

[2] Since the Court grants summary judgment in favor of Laidlaw on Edulog's lost-profits claim, it need not address whether Edulog contractually disclaimed damages for lost profits.

## II.   Edulog's motion for summary judgment

Edulog also filed a motion for summary judgment, asking the Court to dismiss Laidlaw's counterclaim for declaratory relief. In its counterclaim, Laidlaw asks the Court to declare: (1) that Laidlaw has the right to terminate the Agreement and (2) which rights and obligations continue after the termination of the Agreement.  The Court grants the motion in part.

While Laidlaw seeks declaratory relief with respect to the entire Agreement, the key provision at issue here—and the only one seriously discussed in the briefs—is the best-efforts provision (Section § 2.3.3 of the Agreement). Laidlaw claims that its duties under the best-efforts provision are terminable at will after a reasonable period of time because the duration of the parties' obligations is indefinite. Edulog counters that the duration is not indefinite. Instead, it argues, the duration of the best-efforts provision is directly linked to and the same as the duration of the non-exclusive license—"perpetual and irrevocable."

The parties have spilled a lot of ink discussing various theories in support of their arguments, but, as Edulog correctly argues, the Ninth Circuit has already addressed this issue. In its memorandum disposition, the court held that the best-efforts provision, along with the other "core duties" in Section 2.3, "continue during the perpetual non-exclusive license period." *Edulog*, 2010 WL 3005986 at

\*1. The court's conclusion is the law of the case. *See Manufactured Home Communities, Inc. v. Co. of San Diego*, 655 F.3d 1171, 1181 (9th Cir. 2011) ("The law of the case doctrine precludes a court from reconsidering an issue previously decided by the same court, or a higher court in the identical case." (citations and internal quotation marks omitted)). So Edulog is right—the duration of the best-efforts provision is "perpetual and irrevocable," the same as the non-exclusive license provision. The Court treats this fact as "established in the case" under Federal Rule of Civil Procedure 56(g).

Since the duration of the best-efforts provision is "perpetual and irrevocable," it is enforceable and neither indefinite nor terminable at will under Montana law.[3] Montana's statute adopting Article 2, Section 309, of the Uniform Commercial Code provides: "Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party."[4] Mont.

---

[3] Section 22.0 of the Agreement provides that any disputes arising out the Agreement will be governed by Washington law. The parties, however, waived the effect of that section and stipulated that Montana law controls. (Dkt # 25, ¶ 4.m.)

[4] In Section 23.0 of the Agreement, the parties agreed to be governed by the Uniform Commercial Code. In particular, they agreed: "To the extent that this Contract entails delivery or performance of services, such services shall be deemed 'goods' within the meaning of the . . . Uniform Commercial Code, except when to do so deem such services as 'goods' would result in an absurdity."

Code Ann. § 30–2–309. The Montana Supreme Court has not addressed whether a "perpetual and irrevocable" provision is "indefinite" under this statute. So this Court's task is to predict how the Supreme Court would treat it. *Jerry Beeman & Pharm. Servs., Inc. v. Anthem Prescription Mgt., LLC*, 652 F.3d 1085, 1106 (9th Cir. 2011).

In the past, the Montana Supreme Court has looked to California contract law when shaping its own. *Reier Broad. Co., Inc. v. Kramer*, 72 P.3d 944 (Mont. 2003); *Safeco Ins. Co. of Am. v. Liss*, 16 P.3d 399 (Mont. 2000). California has adopted the same U.C.C. section above, and the courts have concluded that an express, perpetual contract is not terminable at will under that section. *Zee Med. Distributor Assn., Inc. v. Zee Med., Inc.*, 94 Cal. Rptr. 2d 829, 834–37 (Cal. Ct. App. 2000) (discussing *Consol. Theatres, Inc. v. Theatrical Stage Employees Union*, 447 P.2d 325 (Cal. 1968)); *Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1104 (E.D. Cal. 2010). Other states take a similar view. *See e.g. S. Wine & Spirits of Nev. v. Mt. Valley Spring Co., LLC*, 646 F.3d 526, 532 (8th Cir. 2011) (applying Nevada law); *Chapman v. N.Y. St. Div. for Youth*, 546 F.3d 230, 236–37 (2d Cir. 2008) (applying New York law); *Klamath Off-Project Water Users, Inc. v. Pacificorp*, 240 P.3d 94, 99–100 (Or. App. 2010) (applying Oregon law). Given these other courts' treatment of the issue, the Court predicts

that the Montana Supreme Court would likewise conclude that a perpetual contract is enforceable, as long as it is expressly designated as such. *Cf. City of Billings v. Pub. Serv. Comn. of Mont.*, 631 P.2d 1295, 1306 (Mont. 1981) ("Where a contract is not expressly made perpetual by its terms, construction of such contract as perpetual is disfavored.").

Since the Ninth Circuit has already concluded that the duration of the best-efforts provisions is perpetual and irrevocable—and the Montana Supreme Court would likely conclude that such a provision is enforceable—the Court grants summary judgment in favor of Edulog as to that provision.

The Court, however, sees no need to address the enforceability of any other provisions or rights in the Agreement because the parties only discuss the best-efforts provision in their briefing.

## CONCLUSION

The Court grants summary judgment in favor of Laidlaw on Edulog's claim for lost profits. But it denies Laidlaw's motion as to look-up-access damages and lost royalties. As to Edulog's motion, the Court grants summary judgment in favor of Edulog on the question of whether the best-efforts provision is perpetual, irrevocable, and enforceable. The Court concludes that it is. The Court, though, denies Edulog's motion to declare the remaining rights and obligations under the

23

Agreement.

IT IS ORDERED that Laidlaw Transit's motion for summary judgment (dkt # 195) is GRANTED IN PART and DENIED IN PART. The Court GRANTS summary judgment in favor of Laidlaw on Education Logistics' claim for lost profits. The Court DENIES Laidlaw's motion as to look-up-access damages and lost royalties.

IT IS FURTHER ORDERED that Education Logistics' for summary judgment (dkt # 198) is GRANTED IN PART and DENIED IN PART. The Court Grants summary judgment in favor of Education Logistics on the question of whether the best-efforts provision in the 1992 Agreement (Section § 2.3.3) is perpetual, irrevocable, and enforceable. The Court concludes that it is. The Court DENIES the balance of the motion.

Dated this 8th day of March 2012.


DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT

24