IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| EDUCATION LOGISTICS, INC., a Montana corporation, and LOGISTICS MANAGEMENT, INC., a Washington corporation,<br><br>      Plaintiffs,<br><br> vs.<br><br>LAIDLAW TRANSIT, INC., a Delaware corporation,<br><br>      Defendant. | CV 07–06–M–DWM<br><br><br>ORDER |

Following the jury's award of $28.4 million, Laidlaw moves for judgment as a matter of law, a new trial, and to amend the judgment. When jury instructions were settled, I submitted the full panoply of damage instructions with the caveat that I would consider the consequential damages argument anew, if it appeared such damages were part of the verdict. A hearing was held on the pending motions on March 13, 2013. Having considered the arguments, Laidlaw's motion is granted in part. The jury award is reduced because the jury awarded consequential damages, damages which are expressly precluded by the Agreement. The motion is denied with respect to the other issues.

1

## BACKGROUND

The jury awarded Edulog $28,408,712. This award was based on two claims made by Edulog: (1) Laidlaw didn't use its best efforts to promote Edulog's software and (2) Laidlaw gave school districts unauthorized look-up access to Edulog's software. The verdict awarded damages as follows:

**Best efforts claim**

Lost license fees:                              $8,596,956

Lost annual licenses and maintenance fees:  $8,596,956

Lost perpetual license fees:                 $70,000

Lost royalties:                              $9,460,000

**Unauthorized look-up access**

Lost license fees:                           $842,800

Lost annual license and maintenance fees:   $842,800

(Jury Verdict, doc. 328.)

Prior to the close of the case, Laidlaw moved for judgment as a matter of law as to whether the annual license and maintenance fees constituted consequential damages that should be excluded. (Transcript, doc. 353 at 167.) The parties were advised that the Court was reserving its ruling on Laidlaw's motion for judgment as a matter of law, as it pertained to consequential damages, until

after the jury returned its verdict. (Transcript, doc. 348 at 166–171, doc. 354 at 166.)

In addition to this issue, Laidlaw also moved for judgment as a matter of law with respect to Neil Beaton's expert testimony, arguing that his testimony should be excluded for a variety of reasons. (Transcript, doc. 353 at 167–69.) Beaton was allowed to testify after a F. R. Evid. 104 hearing was conducted outside the presence of the jury; while I expressed reservations concerning some of his assumptions. (*Id.* at 175.) I determined it was a matter of the weight to be given his opinion as opposed to its admissibility.

## SUMMARY CONCLUSION

The jury's verdict is reduced by $9,509,756. The annual license and maintenance fees—$9,439,756—are consequential damages, which are expressly precluded by the Agreement. Moreover, the $70,000 awarded for lost perpetual license fees is duplicative of the award for lost license fees. This amount is also subtracted from the award. Laidlaw's motions are denied in all other respects.

## STANDARD

There are three standards that apply to Laidlaw's motion: the standards for (1) motion for judgment as a matter of law, (2) motion for a new trial, and (3) motion to alter or amend the judgment.

3

I.      **Rule 50(b): Motion for Judgment as a Matter of Law**

Laidlaw raises several issues in its Rule 50(b) motion. Different standards apply to different issues because Laidlaw raised some of its arguments in its Rule 50(a) motion but not others.

A.      **Review of issues first raised in a Rule 50(a) motion**

Rule 50 allows a party to move for judgment as a matter of law before the case is submitted to the jury and to then renew that motion after the verdict is returned. Fed. R. Civ. P. 50(a), (b). Laidlaw has done so here, with respect to some of the issues. If a party moves for judgment as a matter of law on a particular issue before the case is submitted to the jury and the court does not rule on the motion, then "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b).

The same standard applies to both a motion for judgment as a matter of law made under Rule 50(a) and a renewed motion made under Rule 50(b). *EEOC. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961–63 (9th Cir. 2009); Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* vol. 9B, § 2537 (3d ed.) ("The standard for granting a renewed motion for judgment as a matter of law

4

under Rule 50(b) is precisely the same as the standard for granting the

pre-submission motion under Rule 50(a).")

When considering a Rule 50(b) motion, the court reviews the jury's verdict

for substantial evidence. *Id.* (citations omitted). "'[T]he court . . . may not make

credibility determinations or weigh evidence.'" *Id.* (quoting *Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "Rather, [it] must view the

evidence in the light most favorable to the non moving party . . . and draw all

reasonable inferences in that party's favor." *Id.* (citations and internal quotation

marks omitted). "The test applied is whether the evidence permits only one

reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.*

(citations and internal quotation marks omitted).

When a Rule 50(b) motion presents a question of law or a mixed question of

law and fact, the court presumes that the jury resolved the underlying factual

disputes in favor of the verdict, and the court leaves those findings undisturbed if

they are supported by substantial evidence. *See Kinetic Concepts, Inc. v. Smith &*

*Nephew, Inc.*, 688 F.3d 1342, 1356–57 (Fed. Cir. 2012) (citations omitted). It is

then necessary to examine the legal arguments to see whether they are correct in

light of the presumed jury findings. *Id.* (citations omitted).

**B.     Review of issues not raise in a Rule 50(a) motion**

"[A] party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *Go Daddy Software*, 581 F.3d at 961 (citations and internal quotation marks omitted). If a party fails to raise an argument in a pre-verdict motion for judgment as a matter of law, the general rule is that a court will review the argument for plain error. *Id.* at 961 (citations and internal quotation marks omitted). Plain error exists only if the jury's verdict "would result in a manifest miscarriage of justice." *Id.* This review is "extraordinarily deferential" and "limited to whether there was any evidence to support the jury's verdict." *Id.* at 961–62.

Some of the arguments that Laidlaw raises here present a unique situation—some either were or were not raised in Laidlaw's summary judgment briefing but were not raised in its Rule 50(a) motion. Edulog argues that those arguments are therefore waived.

Ninth Circuit case law suggests that those questions might not be waived, at least for purposes of appeal. If a party raises a pure question of law before the case goes to the jury (e.g., in summary judgment briefing) then, the party does not need to raise those arguments in a Rule 50(a) or Rule 50(b) motion to preserve the

arguments for appeal. *See Cochran v. City of L.A.*, 222 F.3d 1195, 1200 (9th Cir. 2000); *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365 (9th Cir. 1987) ("As long as a party properly raises an issue of law before the case goes to the jury, it need not include the issue in a motion for a directed verdict in order to preserve the question on appeal.")  The reason for this rule is that a pure question of law does not implicate the sufficiency of the evidence presented to the jury, which is in the purview of Rule 50. This rule might suggest that a district court could consider a legal question raised in a Rule 50(b) motion and motion for summary judgment but not raised in a Rule 50(a) motion.

Moreover, the Seventh Circuit has held that a district court may revisit after trial issues raised at the summary judgment stage "if he has a conviction at once strong and reasonable that the earlier ruling was wrong, and if rescinding it would not cause undue harm to the party that benefitted from it." *Avitia v. Metro. Club of Chicago Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995) (citing *Ariz. v. Cal.*, 460 U.S. 605, 618 n.8 (1983)).

Here, Laidlaw is now asking to revisit questions that Laidlaw raised in its summary judgment motion but that the Court, at the time, determined that it did not need to resolve. Laidlaw did not raise those same arguments in its Rule 50(a) motion, but it did raise them in its Rule 50(b) motion. It is unnecessary to resolve

7

what standard applies to these particular arguments, though, because, as discussed below, they fail on the merits under any standard.

## II.     Rule 59(a): Motion for a new trial

A district court may grant a new trial under Rule 59(a) if the verdict "is against the great weight of evidence, or if it is quite clear that the jury has reached a seriously erroneous result." *SEC v. Todd*, 642 F.3d 1207, 1225 (9th Cir. 2011) (citations and internal quotation marks omitted). A new trial may be warranted even if there is substantial evidence to support the verdict. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007). Unlike a Rule 50(b) motion, "The judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Const. Co.*, 833 F.2d at 1371. And, "Unlike a motion for judgment as a matter of law, a motion for a new trial does not have to be preceded by a Rule 50(a) motion prior to submission of the case to the jury." *Freund v. Nycomed Amersham*, 347 F.3d 752, 765 (9th Cir. 2003). "'If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.'" *Id.* (quoting *Federal Practice and Procedure*, § 2806 (1973)).

8

### III.     Rule 59(e): Motion to Alter or Amend the Judgment

"It is appropriate for a court to alter or amend judgment under Rule 59(e) if (1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law." *Duarte v. Bardales*, 526 F.3d 563 (9th Cir. 2008) (citation and internal quotation marks omitted).

ANALYSIS

### I.     Consequential damages

Laidlaw argues that certain categories of damages found by the jury should be excluded because they are consequential damages, the recovery of which is expressly barred by the Agreement. Its argument is partially correct. The annual license and maintenance fees are consequential damages and should be deducted from the jury's award.

### A.     "Consequential damages" defined

Montana Code Annotated § 27–1–311 sets out the damages available for a breach of contract:

> For the breach of an obligation arising from contract, the measure of damages, except when otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment which was proximately caused thereby or in the ordinary course of things would be likely to result therefrom. Damages which are not

9

clearly ascertainable in both their nature and origin cannot be recovered
for a breach of contract.

This law permits recovery of two types of damages: (1) "general damages"—i.e,

damages that are proximately caused by the breach and (2) "consequential

damages"—i.e., damages that, in the ordinary course of things, would be likely to

result from the breach. *See Mont. Petroleum Tank Release Compen. Bd. v.*

*Crumleys, Inc.*, 174 P.3d 948, 961 (Mont. 2008); *Byrum v. Andren*, 159 P.3d 1062

(Mont. 2007). The Montana Supreme Court explained that general damages "are

damages the law would impute as the natural, necessary and logical consequence

of the wrong or breach." *Byrum*, 159 P.3d at 1075. Consequential damages, on the

other hand, "are the natural but not necessary result of the wrong or breach." *Id.*

Consequential damages must also be "contemplated" by the parties at the

time of contracting. *McEwen v. MCR, LLC*, ___ P.3d ___, 2012 WL 6740153

*11–*12; *Mont. Petroleum*, 174 P.3d at 961; *Ehly v. Cady*, 687 P.2d 687, 695

(Mont. 1984). This means that the parties "were aware that the damages would

result from a breach of contract." *McEwen*, 2012 WL 6740153 at *11–*12. In

other words, the parties must know or expect, at the time of contracting, that the

specific consequential damages will naturally result from a breach. The *McEwen*

Court noted that "[t]he terms of the contract help demonstrate whether the parties

10

contemplated that certain damages may result from the breach of contract." *Id.* at *12 (citation omitted).

The "contemplated" requirement is an important one. If the parties did not contemplate the specific damage claimed, then the damage is not consequential (and it is certainly not general or direct).

### B.     Annual License and Maintenance Fees

Before this case went to the jury, Laidlaw properly moved under Rule 50(a) for a directed verdict on Edulog's claim for annual license and maintenance fees. Annual license and maintenance fees are the annual fees—in addition to the one-time, initial license fee—that Edulog collects from school districts in exchange for maintenance and improvement of the software. (Transcript, Doc. 347 at 174.)

Laidlaw argued before and at trial that these damages are consequential damages that are expressly precluded in the Agreement. As set forth above, ruling on this issue was deferred until after the verdict was returned. (*See* Transcript, doc. 348 at 166–171, doc. 354 at 166). The jury awarded $8,596,956.00 in lost annual license and maintenance fees for Edulog's best efforts claim and $842,800.00 in lost annual license and maintenance fees for Edulog's unauthorized look-up access claim. After the verdict, Laidlaw renewed its Rule 50 motion following the entry of judgment. Edulog attempts to shift the issue by insisting that the award for

11

annual license and maintenance fees should not be excluded because the award is for general rather than consequential damages.

Laidlaw has the better argument. The annual license and maintenance fees can hardly be characterized as general damages. The Agreement makes no mention whatsoever of annual license and maintenance fees. (*See* Agreement, doc. 337-6.) It does not, for instance, require payment for annual license and maintenance fees. Lost annual license and maintenance fees are not the "natural, necessary and logical consequence of" Laidlaw's breach of the Agreement. *See Byrum*, 159 P.3d at 1075.

Edulog takes the position that the annual licenses and maintenance fees are not merely fees for upgrades and maintenance. Instead, "They are <u>license</u> fees required for a district to continue as a licensed user, which Laidlaw has an ongoing duty to promote" (emphasis original). Edulog claims that § 4.7.3 of the Agreement requires annual license and maintenance fees from the school districts:

> In addition to the contract price and Royalties aforesaid, Laidlaw will pay to [Edulog]: . . . payment based on regional prices set forth on Schedule B for any installation with a Laidlaw customer where the Laidlaw Customer requires its own ownership of the software license. The regional price schedule will be updated September 1, 1992, and annually thereafter. In such case [Edulog] will grant a license for the Software directly to such Laidlaw Customer, *without further charge*, and Laidlaw may charge the Laidlaw Customer for such license.

(Agreement, doc. 337-6 at § 4.7.3 (emphasis added).)

Edulog's argument is defied by the plain language of § 4.7.3. Nothing in this section implies that Edulog will continue to charge school districts (i.e., "Laidlaw Customer") annual license and maintenance fees after the school district has purchased a license. If anything, the provision prohibits such ongoing charges—the license is granted to the school district "without further charge."

The fact that Edulog was able to recover annual license and maintenance fees from the school districts does not mean that the Agreement expressly permitted those fees. Nothing in the Agreement suggests that lost annual license and maintenance fees are a "natural, necessary and logical consequence of" Laidlaw's breach of the Agreement.

The conclusion here is that the annual license and maintenance fees are consequential damages and would be expressly barred by § 13.0 of the Agreement: "LAIDLAW SHALL NOT BE LIABLE FOR INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES . . . ." But these fees are not likely even consequential damages—there is no evidence that the parties "contemplated" annual license and maintenance fees at the time of contracting. *See McEwen*, ___ P.3d ___, 2012 WL 6740153 at *11–*12. There was no testimony at trial indicating that the parties discussed annual license and maintenance fees at the

13

time of contracting. And, if anything, the terms of the contract suggest that Edulog

could not charge such fees. So, even if the lost annual license and maintenance

fees are the natural but not necessary result of the breach, Edulog could not

recover them because there is no evidence indicating there is reason to believe that

the parties "contemplated" those fees at the time of contracting. *Id.*

The annual license and maintenance fees must be deducted from the verdict.

This is a reduction of $9,439,756.

### C.     All the other types of damages

Laidlaw does not limit its consequential damages argument to only annual

license and maintenance fees. Laidlaw claims that $26,723,912 of the award—i.e.

all but the  $842,000 award for lost license fees on Edulog's unauthorized look-up

access claim—are consequential damages. The $26,723,912, Laidlaw insists, was

for anticipated lost profits from hypothetical transactions with third parties. As

such, it argues, those damages are consequential. The $842,000 for lost license

fees on Edulog's unauthorized access claim, on the other hand, resulted from

transactions that actually occurred and were direct damages.

Since the lost annual license and maintenance fees are consequential and

unrecoverable, this leaves for consideration the lost license fees, the lost perpetual

license fees, and the lost royalties associated with Edulog's best efforts claim.

14

As an initial matter, Laidlaw argues that the $70,000 awarded for lost perpetual license fees was an alternative to an award for lost full license fees. Awards for both lost perpetual license fees and lost full license fees would therefore be duplicative. Edulog did not object to this proposition in its briefing.[1] In fact, Edulog's expert testified to that effect. (*See* Transcript, doc. 352 at 230–31, 294–96.) Because the $70,000 is duplicative, it is necessary to reduce the verdict by $70,000. As a result, it is unnecessary to resolve whether the lost perpetual license fees are consequential damages.

This leaves open the question involving the lost license fees and lost royalties associated with the best efforts claim. These damages are not consequential; they are general.

Laidlaw did not make this argument in its Rule 50(a) motion. In its Rule 50(a) motion, Laidlaw argued only that annual license and maintenance fees were consequential. (*See e.g.* Transcript, doc. 348 at 166–171, doc. 354 at 166.) It did not argue that the same is true with respect to lost license fees and lost royalties associated with Edulog's best efforts claim.

---

[1] Edulog objected to this reduction at the hearing for these motions and claimed that Laidlaw did not properly raise the issue in its opening brief. Not so. Laidlaw raised the issue in a footnote in its opening brief, and Edulog has not provided any legal authority that demonstrates Edulog's mention of the $70,000 was legally deficient.

But, in its motion for summary judgment, Laidlaw made that argument:

> Here, Edulog is seeking to recover revenue that it claims would have
> been generated absent Laidlaw's alleged breach of the 1992 Agreement.
> In short, Edulog is seeking consequential damages, the recovery of
> which was disclaimed by Laidlaw in the 1992 Agreement.
> Consequently, Laidlaw is entitled to summary judgment with respect to
> all of the damages being sought by Edulog.

(Doc. 196 at 23.) Given the posture of the case, the Court did not reach this issue

in its summary judgment order. (*See* Doc. 252.)

Laidlaw preserved this argument for appeal. *See Cochran*, 222 F.3d at 1200;

*Landes Constr. Co.*, 833 F.2d at 1371 ("As long as a party properly raises an issue

of law before the case goes to the jury, it need not include the issue in a motion for

a directed verdict in order to preserve the question on appeal.") (*See also* the

discussion above, Section I, A and B.)

Even assuming that Laidlaw's argument is preserved for purposes of its

Rule 50(b) motion, and regardless of which standard applies, the argument fails on

the merits.

Laidlaw relies on several cases and secondary sources standing for the

"hornbook" proposition that lost profits are consequential damages. It is unclear

which hornbook they are reading because the law is at odds with Laidlaw's

argument.

16

While lost profits *may* be consequential damages, they are not *necessarily* consequential damages. Lost profits may be recovered as direct damages in some circumstances—for example, when profits are the object of and inducement to the contract:

> But where the very object of, and inducement to, a particular contract, are the profits which are to accrue to one of the parties to it, and these facts are understood by both in making and carrying out the agreement, so far as it is carried out, then, for a wrongful breach of that contract by the other party to it, the one whose profits are thus cut off may recover his loss of profits as general damages, upon the theory that such loss will necessarily result from the breach of that character of contract.

*Green v. Wolff*, 372 P.2d 427, 431 (Mont. 1962); *see also Carlson v. Stone-Ordean-Wells Co.*, 107 P. 419 (Mont. 1910). The same is true in other jurisdictions. S*ee also Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151 (10th Cir. 2007); *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007); *Valve Corp. v. Sierra Ent.*, 431 F. Supp. 2d 1091, 1101–02 (W.D. Wash. 2004); *In re Rock & Republic Enters. Inc.*, 2011 WL 6445420 at *4–*5 (Bankr. S.D.N.Y. Dec. 22, 2011); *In re Buffalo Coal Co.*, 424 B.R. 738, 745–46 (Bankr. N.D. W. Va. 2010).

This view of lost profits, rather than Laidlaw's, is hornbook law. Laidlaw's argument overreaches and ignores clear precedent in this jurisdiction and others.

In this case, the royalties and license fees were the very objects of the

17

Agreement, and they induced Edulog to enter the Agreement. The awards for lost license fees and lost royalties associated with Edulog's best efforts claim are therefore recoverable as general damages, they are not consequential damages.

## II.   Neil Beaton's testimony

Laidlaw next argues that the economic analysis of Edulog's damages expert, Neil Beaton, was "speculative, scientifically unsupported, legally unsupportable, mathematically and mechanically unreliable, highly prejudicial, and could not provide evidentiary support for the verdict." (Laidlaw's Opening Br., doc. 337 at 18.) Laidlaw makes a number of arguments supporting its claims, but each fails.

### A.   The March 8, 2012 summary judgment order

As a threshold matter, Laidlaw argues that Beaton's analysis was merely an analysis of lost profits, which the Court had earlier precluded in its March 8, 2012 summary judgment order. (*See* doc. 252.)

In its summary judgment order, the question of lost profits was addressed only in the context of Dr. Alan Hess's report. Dr. Hess's analysis focused on forecasted loss profits, but his forecast was not tied to specific Laidlaw customers. It was based on a comparison of Edulog's profits to that of a competitor, VersaTrans. The gist of Dr. Hess's reasoning was that Edulog's profits had declined while VersaTrans's had increased, so Laidlaw's conduct must have been

18

the cause of that decline. Dr. Hess's analysis was not tied to actual Laidlaw customers. For the host of reasons described in the summary judgment order, that reasoning and analysis is troublingly flawed and his opinion testimony was properly excluded.

The Court expressly treated the "lost profits" damages analyzed by Dr. Hess separately from the look-up-access and best-efforts damages analyzed by Beaton. On April 4, 2012, after it had issued its summary judgment order, the Court denied Laidlaw's motion to exclude Beaton. In doing so, it was noted that Edulog had hired Beaton "to analyze its alleged look-up-access damages, as well as Laidlaw's alleged failure to use its best efforts to promote Edulog's software." (Doc. 253 at 6.) Given the issues involved in expert trial testimony, I determined the admissibility of Beaton's testimony was better left for trial. In other words—the Court never concluded that Beaton's analysis concerned only "lost profits" and would have been excluded by the summary judgment order.

Significantly, Laidlaw treated the lost profits damages calculated by Dr. Hess—which were expressly excluded—separately from the look-up-access and best-efforts damages calculated by Beaton. (*See* Motion in Limine Brief, doc. 217.) In its brief filed in support of one of its motions in limine, Laidlaw discussed lost profits only with respect to Dr. Hess. Laidlaw never characterized Beaton's

19

analysis as an analysis of lost profits. Instead, it characterized the damages that he discussed as "damages with respect to Edulog's claim that Laidlaw granted school districts unauthorized access to the Software ("look-up access"), and with respect to Edulog's claim that Laidlaw failed to comply with its best efforts obligation." (*Id.* at 21.)

When the April 4, 2012 order denying Laidlaw's motion to exclude Beaton was issued, it made clear that the ruling was not precluding, at that time, the recovery of look-up-access and best-efforts damages based on Beaton's testimony.

### B.   Beaton's "100% assumption"

Beaton testified that his damages analysis and estimates were based on an assumption that 100% of Laidlaw's customers would have purchased Edulog's software if Laidlaw had used its best efforts and had not granted unauthorized access to the software. Laidlaw argues this assumption is wholly unsupported by any evidence. While there might be some weaknesses in Beaton's opinion (perhaps even serious weaknesses), those problems go to the weight, not the admissibility of his opinions.

During trial, the Court permitted Laidlaw's counsel to conduct a thorough voir dire of Beaton outside the presence of the jury to challenge Beaton's assumptions and the basis for his opinions. (Transcript, doc. 352 at 131–72.) That

testimony revealed the following. In calculating the damages caused by the unauthorized look-up access and failure to use best efforts, Beaton assumed that 100% of Laidlaw's customers would have bought Edulog software if Laidlaw had either not provided the unauthorized look-up access to the software or had used its best efforts to promote the software.

Prior to Beaton's testimony, the evidence, according to Edulog, showed that (1) Edulog's software saved all school districts money, even if a district had only one bus (*see e.g.* Transcript, doc. 347 at 269; doc. 352 at 153) and (2) the Edulog software was easier to use and preferable to other programs (*see e.g.* Transcript, doc. 351 at 45–52).

Beaton then contended that the superiority of the Edulog software, combined with Laidlaw's warm relationship with its customers, would have meant that every rational customer would have purchased Edulog's software if Laidlaw hadn't provided unauthorized look-up access or had used its best efforts to sell the software. (*See e.g.* Transcript, doc. 352 at 151–54.) Beaton, then, had a factual basis for his assumption and analysis, even if it was a weak basis.

Laidlaw clearly believed that Beaton's assumption was ill founded, and Laidlaw's counsel shrewdly challenged Beaton in voir dire and cross-examination—asking him whether customers always made rational decisions and,

21

if not, how Beaton could then assume that 100% of Laidlaw's customers would have acted rationally and purchase Edulog software. Moreover, would all of Laidlaw's customers have thought that Edulog was a superior product? Beaton stuck to his guns, claiming that every customer would have purchased Edulog's software.

As the Court explained in its March 8, 2012 summary judgment order, Rule 702 and 403 make clear that a court may exclude expert testimony if the proffered testimony is misleading or wholly unsupported by the facts. *Moses v. Payne*, 555 Pf.3d 742, 756 (9th Cir. 2009); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806 (9th Cir. 1988); *Wood v. Mont. Dept. of Revenue*, 2011 WL 4348301 at *2 (D. Mont. Sept. 16, 2011).

But if the facts even weakly support the opinion, then a critique of that opinion goes to its weight, not admissibility. *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 (9th Cir. 1987) ("The relative weakness or strength of the factual underpinnings of the expert's opinion goes to weight and credibility, rather than admissibility. The weakness in the underpinnings of [expert] opinions may be developed upon cross-examination and such weakness goes to the weight and credibility of the testimony.") (citations and internal quotation marks omitted). This Court previously observed:

22

"[R]elevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation. However, absolute certainty is not required. Expert testimony is admissible which connects conditions existing later to those existing earlier provided the connection is concluded logically. Whether this logical basis has been established is within the discretion of the trial judge and the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility."

*Livingston v. Isuzu Motors, Ltd.*, 910 F. Supp. 1473, 1493 (D. Mont. 1995)

(quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662–63 (11th Cir. 1988)).

Here, Beaton connected—even if weakly—the factual record to his opinion. Beaton's opinion that a rational customer would have purchased the Edulog software because it would have saved the customer money and was superior to competitor products is facially logical. But, as Laidlaw's counsel aptly showed in voir dire and then cross-examination before the jury, there might very well be some valid critiques of that analysis. For instance, not all customers might behave rationally and not all customers might have viewed Edulog as a superior product. Those critiques, though, go to weight, not admissibility.

Laidlaw's counsel thoroughly communicated these critiques and others to the jury. (*See* Transcript, doc. 352 at 246–310; doc. 353 at 25–46.) He then revisited those critiques during closing arguments. (*See* Transcript, doc. 354 at 135.) The jury's verdict arguably shows that the cross-examination had a

23

significant impact in that the jury did not afford Beaton's testimony all the weight that Edulog had hoped for—it awarded less than half the damages that Beaton estimated. Nor did it apply a much different standard in evaluating the testimony of Laidlaw's expert. The verdict the jury reached is well within their prerogative, given the conflicting proof they had to consider.

The verdict is not reduced nor is there an order for a new trial on account of this aspect of Beaton's testimony.

### C.     Beaton's "acceleration assumptions"

Edulog also argues that Beaton's "acceleration assumptions" had no basis in fact and warrant a new trial. The acceleration assumptions concern the statute of limitations that apply to Edulog's claims—that is, Edulog can recover only for breaches that occurred on or before January 11, 2003.

Beaton assumed that if a Laidlaw customer purchased a competitor's software prior to January 11, 2003, then that customer would have purchased Edulog's software after that date if Laidlaw had used its best efforts. In other words, the best efforts obligation was ongoing. So, Beaton maintained, even if a customer purchased competitor software (or no software) prior to January 11, 2003, breaches still occurred with that customer after January 11, 2003.

With respect to the unauthorized look-up access claim, Beaton assumed that

if Laidlaw had been providing a customer unauthorized access prior to January 11, 2003, and would have been forced to start charging its customers for that access on or after January 11, 2003, then the customer would have purchased a license on that date.

Laidlaw complains that Beaton's assumption is merely an end-run around the statute of limitations.

Laidlaw's counsel was allowed to examine Beaton in voir dire on this issue. After that voir dire, the Court instructed the jury on the applicable statute of limitations:

> Edulog's claim for breach of contract is subject to a four-year statute of limitation, which means that Edulog may be awarded damages for Laidlaw's breaches of the Agreement, if any, occurring in or after January 11, 2003.
>
> Laidlaw is not legally liable for breaches of contract, if any, that occurred prior to January 11, 2003. You may, however, consider evidence that pre-dated January 11, 2003 to assist in the interpretation of the Agreement and to decide whether Laidlaw failed to perform its duties under the Agreement after January 11, 2003.

(*See* Jury Instruction 21, doc. 326; Transcript, doc. 352 at 173.)

Laidlaw's counsel asked probing questions of Beaton on cross-examination, asking if he was accelerating the installation dates in order to get around the statute of limitation. (*See* Transcript, doc. 352 at 275–77, 281–83.) He said that he

25

wasn't and again explained the basis for his assumptions, as described above. In his closing argument, Laidlaw's counsel again made an attack on Beaton's acceleration assumptions. (*See* Transcript, doc. 354 at 135.)

Beaton's assumption might be fragile and is, perhaps, weakly supported, but Laidlaw sharply cross-examined Beaton on these points and exposed its view of the weakness to the jury. Moreover, the jury was expressly instructed that it could not consider, for purposes of damages, any breaches that occurred prior to January 11, 2003.

### D.    Beaton's mathematical errors

Beaton admitted at trial that there were mathematical and mechanical errors in his schedule of damages. Laidlaw argues the jury should, as a result, not have been allowed to consider the schedules. This critique, goes to the weight, not admissibility of Beaton's testimony. Laidlaw's counsel thoroughly highlighted these errors for the jury when he cross-examined Beaton and during closing argument. (*See* Transcript, doc. 353 at 29–44; doc. 354 at 135.) He had the opportunity, then, to cure any prejudicial or misleading effect those errors might have had and to further undermine the weight to be given to Beaton's opinions and analysis.  That is the function of good cross examination and persuasive argument.

### E.     Beaton's testimony regarding First Student/Laidlaw's revenue

Beaton testified about First Student/Laidlaw's annual revenues and profits during 2012. (Transcript, doc. 352 at 191–97.) Laidlaw objected, but that objection was overruled. Laidlaw now takes the position that the testimony was prejudicial and warrants a new trial.

In cases where punitive damages may be awarded, evidence of a company's revenues and profits may be admissible. *999 v. C.I.T. Corp.*, 776 F.2d 866, 872 (9th Cir. 1985). If punitive damages aren't at issue, though, such evidence is inadmissible and would warrant a new trial. *Id.* (citing *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977); *Farmy v. College Housing, Inc.*, 48 Cal. App. 3d 166, 183 (Cal. App. 2d Dist. 1975)).

Edulog argues that Beaton's testimony was proper for two reasons: (1) it was based solely on a stipulated exhibit and (2) Laidlaw opened the door for the testimony because it claimed it didn't have the revenue to perform its obligations under the contract.

It is unnecessary to reach the second rationale because the first is dispositive. Beaton's testimony was based solely on Exhibit 663, a stipulated exhibit. Laidlaw stipulated to the admissibility of that exhibit without qualification. Laidlaw now claims that it did not expect Edulog to use the exhibit

27

to show First Student/Laidlaw's revenues and profits. But, when the exhibit was admitted, it was admitted for any purpose without qualification. If Laidlaw wanted to preserve any unknown objection it might have had to the exhibit, then it should not have stipulated to it. "Erroneously admitted evidence is not prejudicial if the facts had already been shown by admissible evidence." *Benna v. Reeder Flying Serv., Inc.*, 578 F.2d 269, 272 (9th Cir. 1978) (citations omitted).

## III.   Sufficiency of the evidence

Finally, Laidlaw argues that the jury's award as to Edulog's best efforts and unauthorized look-up access claims is not supported by substantial evidence. Laidlaw essentially re-hashes the same arguments it gave to the jury in closing argument. As Edulog discusses in its response brief, there is evidence upon which a reasonably jury could have based its award. *See Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012) ("In reviewing whether a district court abused its discretion in denying a motion for remittitur or new trial, we decide whether the jury's award was supported by reasonable inferences and assessments, based on substantial evidence in the record.") Moreover, while the jury awarded the same damage amounts across different categories of damages, that correctable error alone does not warrant a new trial. Except as discussed above, the court will not second guess the jury's calculation of damages.

28

## CONCLUSION

The Court deducts from the jury's award the lost annual licenses and maintenance fees—$9,439,756—and the lost perpetual license fees—$70,000. Laidlaw's motion is denied in all other respects.

IT IS ORDERED that Laidlaw's motion (doc. 336) is GRANTED IN PART and DENIED IN PART. The jury's award shall be reduced by $9,509,756. The Clerk is directed to issue an amended judgment reflecting this reduction.

Dated this 1st day of April 2013.

_____
DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT

29